Argued 26 January, decided 10 April, 1905.

**PACIFIC MILL CO. *v.* INMAN.**

80 Pac. 424.

CONTRACTS—INDEPENDENT SEPARABLE COVENANTS.

1. Defendant lumber company contracted with plaintiff corporation to subscribe for a certain amount of its capital stock; to be paid for in lumber. Plaintiff agreed to increase its capital stock, to merge its existing business into the new business, to secure land for a lumber yard, to contract with a railway company for the delivery of lumber from a dock, and to secure bona fide subscriptions for a certain amount of its increased capital stock; such subscriptions to be paid in full in from one to four months. *Held,* that this latter agreement was independent and separable, so that strict performance of it was not a condition precedent to a right to maintain an action for failure of defendant to perform its contract.

CORPORATIONS—ADMISSION OF GENUINENESS OF STOCK SUBSCRIPTION.

2. Where defendant and plaintiff corporation entered into a contract which, among other things, required plaintiff to increase its stock, and to obtain subscriptions to a part of it, failure of defendant, on receiving a list

of the subscribers, to object to a subscription purporting to have been made by a corporation, was an implied admission that the subscription was genuine.

CORPORATIONS—IMMATERIAL DEFENSE TO ACTION OF DAMAGES FOR NOT TAKING SUBSCRIBED STOCK.

3. Where defendant and plaintiff corporation entered into a contract which required plaintiff to increase its capital stock and procure subscriptions for a part thereof, the alleged fact that money paid in by the subscribers to the additional stock issue was not used by plaintiff in accordance with its contract with its stockholders was no defense to an action on the contract of defendant to subscribe to the stock.

From Multnomah: ALFRED F. SEARS, JR., Judge.

Statement by MR. JUSTICE BEAN.

This is an action by the Pacific Mill Co. against Robert Inman and others, a corporation, to recover damages for a breach of a contract. The plaintiff is a Hawaiian corporation organized in 1900, with a capital stock of $12,000, and with power to increase the same to $50,000. The defendant is an Oregon corporation engaged in the business of manufacturing and selling lumber. In the spring of 1901, plaintiff, desiring to enlarge its business and to embark in the lumber trade, obtained from a local railway company an option on land for a lumber yard, and an agreement to transport lumber from the dock to the yard at a certain rate. It thereupon wrote to an agent of the defendant at Portland, with whom its officers had previously had some conversation concerning the lumber business, advising him that it had obtained an option for a lumber yard, and proposed increasing its capital stock to $50,000; the present stockholders to retain their $12,000, which was to be declared · paid up; the remaining $38,000 to be subscribed for by parties in Honolulu and by the defendant, and to be "called for as the same may be needed." Upon receipt of this letter, defendant sent Mr. H. R. Duniway to Honolulu, with authority to cooperate with plaintiff in organizing and launching the lumber business as outlined in the letter referred to, if, upon investigation, he found it desirable, and conditions as reported by plaintiff. Mr. Duniway arrived at Honolulu about the 1st of August, and on the 3d of that month, acting for defendant, made and entered into the following contract with plaintiff:

"This Agreement made and entered into this third day of August, A. D. 1901, by and between Inman, Poulsen & Company, a corporation duly incorporated and existing under and

[23—46 Or.]

by virtue of the laws of the State of Oregon, and having its office and principal place of business in the City of Portland, in the said State, hereinafter called the party of the first part, and The Pacific Mill Company, Limited, a corporation duly incorporated under and by virtue of the laws of the Territory of Hawaii, and having its principal office and place of business in Honolulu, in the said Territory of Hawaii, hereinafter called the party of the second part.

"The party of the first part, its successors and assigns, in consideration of the sum of one dollar ($1.00) and the covenants and undertakings hereinafter set out in this agreement, do hereby expressly covenant, promise, and agree to subscribe for and accept $15,000.00 (fifteen thousand dollars) worth of paid-up shares of the capital stock of the party of the second part, and the said party of the second part hereby expressly covenants and agrees to accept in payment for said stock, Oregon pine lumber at the wholesale market and current prices to be fixed and mutually agreed upon subsequently.

"The said party of the second part, their successors and assigns, hereby expressly covenants and agrees that the party of the first part shall have the privilege and right to name and recommend one employee of the said party of the second part, and upon such naming and recommendation the person so recommended and named shall be elected a director of and in the Pacific Mill Company, Limited, and shall hold the office of secretary or manager of the lumber department of the said Pacific Mill Company, Limited, at a salary not to exceed one hundred and fifty ($150.00) dollars per month for the first year. and that he or his successor shall hold and occupy said office.

"The parties hereto reserve the right to alter the amount of salary of the said person so appointed as aforesaid, and such compensation shall be fixed hereafter, subject to the success of the general business of the said Pacific Mill Company, Limited, while the party of the first part shall retain their interest in the said business and in the Pacific Mill Company, Limited, after the first year and upon the appointment of the person so named and recommended by the party of the first part after the expiration of the first year and the commencement of the second year of the appointment as aforesaid. And the said party of the first part shall have the privilege of recommending and naming permanently said director who shall be appointed by the said party of the second part.

"It is also agreed that the said party of the first part hereby covenants and agrees that they shall invoice all lumber that they may ship to the said party of the second part, at the current

wholesale market prices which may prevail from month to month on the Pacific Coast, and the cost of freight and making delivery of said lumber shall be added to this price, which will be subject to change from time to time, as will be mutually agreed upon, dependent on the bona fide changes in the wholesale lumber market on the Pacific Coast.

"The said party of the first part also covenants and agrees to attend to the chartering of all vessels necessary for the delivery of said lumber, and further covenants and agrees to furnish the said party of the second part all the Oregon pine lumber said company may require at the lowest wholesale current market prices.

"Said party of the second part, in consideration of the above undertakings and agreements and covenants to be performed by the said party of the first part, hereby agrees to increase the capital stock of the said Pacific Mill Company, Limited, to fifty thousand ($50,000.00) dollars; also that the present business of the said Pacific Mill Company, Limited, including lease of mill, stock on hand, profits, tools, fixtures, good will, interest in contracts and total assets, shall be turned over and merged in the business of the said Pacific Mill Company, Limited, when the said capital stock shall be increased to fifty thousand ($50,000.00) dollars, and the directors shall declare the present capital stock of the said Pacific Mill Company, Limited, to the amount of twelve thousand ($12,000.00) dollars, to be fully paid up.

"The said party of the second part also covenants and agrees to secure the lease of certain railroad land and a contract covering the unloading of lumber and delivery of same by the said railroad company into the lumber yard as per the terms of option now held by the said Pacific Mill Company, Limited.

"The present stockholders and directors of the Pacific Mill Company, Limited, hereby agree to subscribe or secure subscriptions for the remaining capital stock of the said Pacific Mill Company, Limited, to the amount of twenty-three thousand ($23,000.00) dollars, and they do hereby pledge themselves that such stock subscriptions shall be bona fide, and shall be paid for in one (1), two (2), three (3) and four (4) months, as may be called for by the board of directors from and after September 1, 1901. They also agree that this shall be done, and said details of increasing the capital stock and securing the land and contract shall be completed on or before September 1, 1901, and that the said Inman, Poulsen & Co., the party hereto of the first part, shall be notified in writing to this effect.

"The said party of the second part covenants and agrees that it will buy all its Oregon pine lumber from the said party of the

first part at the lowest wholesale current market prices prevailing on the Pacific Coast, and the said party of the second part also agrees to all the conditions of the said Inman, Poulsen Company to become stockholders of the said Pacific Mill Company, Limited.

"It is also agreed that in case the competitors of the said Pacific Mill Company, Limited, should cut and endeavor to regulate the price of lumber to about cost, or cost, or below cost, that the said Inman, Poulsen Company will allow the said Pacific Mill Company, Limited, a special rebate of $1.00 (one dollar) per thousand from the lowest wholesale prices on merchantable lumber which are prevailing during the time of said cut on all stock sizes. By 'stock sizes' are meant

One inch lumber up to twelve inches wide.

Two inch lumber up to twelve inches wide.

Three inch lumber up to twelve inches wide.

Four inch lumber up to twelve inches wide.

Also 6x6, 6x8, 8x8, 10x10, and 12x12, regular lengths up to and including forty feet. Special sizes or larger and longer sizes than above, also clear lumber, are to be exempt from the special rate herein provided for.

"The said party of the first part, in consideration of the covenants and agreements herein being performed by the said party of the second part, does hereby appoint said Pacific Mill Company, Limited, exclusive agents of the said Inman, Poulsen & Co. for the Territory of Hawaii.

"In witness whereof the said parties hereto have hereunto set their hands and seals this third day of August, A. D. 1901.

Inman, Poulsen & Co.,

By H. R. Duniway, Agent.

Party of the First Part.

Signed and sealed in
  the presence of

    R. C. Geer,

    W. H. G. Arnemann.

Pacific Mill Company, Limited,

Emmet May, President.

W. P. Barry, Secretary."

Immediately after signing the contract, plaintiff proceeded to comply with the provisions that were to be performed by it, increased its capital stock to $50,000, opened stock books, obtained subscribers in Honolulu for $23,000 of such stock, and by letter of August 13th advised the defendant that it was ready to receive lumber under the contract as soon as it could be shipped. This letter was not satisfactory to defendant, and on

the 27th it wrote for further information; asking, among other things, for a list of the names of the new subscribers; a written statement from some Honolulu banker as to the responsibility of such subscribers; a guaranty that the statement of assets and liabilities of plaintiff as made to Mr. Duniway was substantially correct; and for a modification of the contract so that alternate cargoes of lumber should be paid for in cash; stating that, immediately upon receipt of a satisfactory reply, defendant would proceed with the contract, and send a man to Honolulu to manage the business. To this letter the plaintiff replied on September 11, 1901, saying that the first assessment of $5,000 on the stock had all been paid in, and that was a sufficient guaranty as to the balance; that the statement of the assets and liabilities of plaintiff as made to Mr. Duniway was correct; but declined to assent to the suggested modification of the contract, stating that it would take possession of the land for a lumber yard on the 1st of October, and would then be ready to receive and handle lumber; and requested the shipment of an assorted cargo. On the 7th of October, plaintiff again wrote, saying that it was disappointed in not receiving information by the last steamer as to the arrangements defendant had made concerning the shipment of lumber and carrying out its part of the contract; that plaintiff had accepted a lease of land for a lumber yard, and had entered into a contract with the railway company to build a switch to it; that it had a large number of orders for lumber already promised—and inclosed a copy of the subscription list to the new issue of stock, saying that it had made another assessment thereon of 25 per cent. About the time of the receipt of this letter the defendant sent another agent to Honolulu to examine the assets and liabilities of the plaintiff, and ascertain whether the contract had been complied with on its part. His report being favorable, the manager of the defendant and the president of the plaintiff thereafter met in San Francisco, and arranged for the charter of two vessels for the shipment of lumber from Portland to Honolulu. The lumber was shipped as agreed upon. It was, however, not consigned to the plaintiff, but to J. D. Young, an agent of the defendant, who was sent to Honolulu with full power to represent the defendant

in all business transactions between it and the plaintiff. Young arrived in Honolulu before the cargoes of lumber, and, upon investigation, concluded that the contract between plaintiff and defendant "was so honeycombed with fraud and misrepresentations" as not to be valid or binding on defendant, and on December 16, 1901, served a written notice on plaintiff, stating that defendant repudiated the contract and refused further to be bound thereby, for the reason that plaintiff had not complied with the terms thereof on its part to be kept, and that the representations upon the faith of which it was made were not true. The plaintiff thereafter commenced this action to recover damages for a breach of the contract. The complaint sets out the contract in substance and legal effect, and avers full performance thereof by plaintiff, and readiness and willingness to perform, and a breach by defendant. The answer denies the allegations of the complaint, and sets up certain matters as a defense not necessary to be detailed here. At the close of the plaintiff's testimony, the court granted a motion for a nonsuit, and the plaintiff appeals.        REVERSED.

For appellant there was a brief and an oral argument by *Mr. Ralph R. Duniway.*

For respondent there was a brief over the name of *Cake & Cake,* with an oral argument by *Mr. Harry Marion Cake.*

MR. JUSTICE BEAN delivered the opinion of the court.

From the bill of exceptions it appears that "the plaintiff introduced evidence tending to prove all the allegations of its complaint," unless the fact that it had collected on the new subscriptions to its capital stock but $5,500 in September, $187.50 in October, $2,437.50 in November, and $4,875 in December, 1901, shows such a failure to comply with the contract as authorized the defendant to repudiate it, and required the court to grant the motion for nonsuit.

There may be substantially three kinds of covenants or promises in a contract: first, such as are independent of each other; second, such as are mutual and concurrent, and are to be performed at the same time; and, third, promises or covenants which are conditional and dependent, the performance of one depend-

ing upon the performance of the other. In the character of contract first suggested, one party may bring an action against the other for a breach without averring and proving performance on his part. But in the other two, where the contract is entire, and the covenants go to the whole consideration, the plaintiff must show a performance, or that he was ready and offered to perform, before he can maintain an action against the other for a breach of the contract: 9 Cyc. 719. It is often difficult to determine the nature and character of the respective covenants of parties to a contract, and this difficulty has given rise to much apparent confusion in the decided cases. The early adjudications turn wholly upon the technical language of the contract. But the modern rule is that the contract should be construed according to the intention of the parties as gathered from its context and the good sense of each case. The question is one of construction, and, when the intention of the parties is not clearly expressed or is doubtful, certain rules of interpretation are applicable. One of these is that where the contract contains several separate and independent covenants, not covering the whole ground of the contract, and it has been executed or performed in part by one of the parties, a covenant of his going only to a part of the consideration, a breach of which may be paid for in damages, will be regarded as independent, performance of the contract as divisible, and he may maintain an action for a breach thereof by the other party without proving performance of such covenant: Note to *Pordage* v. *Cole,* 1 Saund. 320; Clark, Contracts, 653. Mr. Parsons, in speaking of this question, says that "if the supposed condition covers the whole ground of the contract, and cannot be severed from it or from any part of it, a breach of the condition is a breach of the whole contract, which gives to the other party the right of avoiding or rescinding it altogether. But where the supposed condition is distinctly separable, so that much of the contract may be performed on both sides, as though the condition were not there, it will be regarded as a stipulation, a breach of which only gives an action to the injured party": 2 Parsons, Contracts (9 ed.), *527.

1. Now, applying these rules to the case in hand, and bearing in mind the principle that the intention of the parties is to govern, the solution is easy. There is no stipulation in the contract, express or implied, that the defendant's obligation or liability was dependent upon the prior payment of the amount of the new stock subscriptions, or that any part of them should be paid in before the defendant should be required to begin the performance of the contract on its part. The language of the contract on this point is not happily chosen, but it seems to us that its purport is that plaintiff stipulated and agreed that it would procure bona fide subscriptions from its present stockholders and directors and other parties for $23,000 of the new stock issue, and that such subscription should be paid for in one, two, three, and four months, as might be called by the directors, from and after September 1, 1901. But there is no statement that the payment of such subscriptions was a condition precedent to performance by defendant. The contract on the part of the plaintiff consisted of several distinct items, such as increasing its capital stock, merging its planing mill into the new enterprise, securing land for a lumber yard, contracting with the railway company for the delivery of lumber from the dock to the yard, securing bona fide subscriptions for $23,000 of the capital stock, etc., and completing the details of such items by September 1, 1901, and notifying the defendant of that fact. Now, the plaintiff, relying upon the contract, proceeded at considerable expense and trouble to do all this, except collecting the entire amount due on the subscriptions to its capital stock; and, for the purposes of this case, it must be assumed to have performed all the other conditions on its part in good faith. The entire payments on such subscriptions were not to be made until December 1, 1901, and it can hardly be supposed that the parties contemplated that defendant should not perform any of the covenants on its part or begin such performance until that time. The mere default of the plaintiff in collecting the assessments in full, as levied, did not justify the defendant in repudiating or canceling the contract.

The stock subscriptions were prima facie valid and collectible, and constituted assets of the corporation. After the plaintiff,

relying on the contract, changed its business, enlarged its capital stock, and incurred liabilities, the defendant ought not to be permitted to repudiate and cancel it, in the absence of an express and clear stipulation entitling it to do so. If it had been intended that the entire amount of the new subscription should be paid into the treasury of the plaintiff before compliance with the contract by the defendant, it would, no doubt, have been so provided. This was not done, nor was any claim made by defendant during the protracted negotiations between it and the plaintiff, or at any time prior to the repudiation of the contract, that such was the understanding or agreement of the parties. Indeed, the entire dealings of the parties show to the contrary. The first letter from the plaintiff to defendant inviting it to cooperate in the establishment of a lumber yard said that the proposed subscription for the increased stock should be called as "the same might be needed," and the argument used by the defendant in its letter to the plaintiff of August 27th, asking for a modification of the contract so that alternate cargoes of lumber should be paid for in cash, was that, even under the modification suggested, "we will pay for all our stock by the time the other subscribers would have paid for about one half of theirs," and "in this way our firm will not pay for their stock in full much before the other subscribers pay for theirs." Under date of September 11, 1901, the plaintiff wrote the defendant that "75 per cent of the stock subscribed for here will be paid in by the time we get our first lumber," and again, on the 7th of October, that fifty per cent of the stock subscriptions had been called, and that it was the intention of the directors to call the balance "soon in order to have all the stock fully paid up by the time the lumber guaranteed you is received." This correspondence shows that both parties understood that lumber was to be shipped by the defendant to plaintiff in pursuance of its contract before the stock should be paid for in full. The motion for nonsuit on the ground suggested, therefore, was not well taken, and should have been overruled.

2. This disposes of all the questions strictly arising on this appeal, although there were others urged by the defendant's counsel. The bill of exceptions recites that the plaintiff gave

evidence tending to support all the allegations of its complaint, and therefore necessarily showed full performance on its part, except in the matter of collecting the amounts due on the stock subscription. The defendant, however, argues that the motion for a nonsuit was properly sustained, because one of the subscriptions purports to have been made by the Honolulu Investment Co., and there was no proof of its organization, or of its power to subscribe for stock in the plaintiff corporation; that the money paid on the stock subscription was not used by the plaintiff in accordance with the contract between it and the stockholders; that one of the stockholders had repudiated his contract, and refused to pay any amount thereon; and that plaintiff failed to show that all the subscriptions were bona fide. It is quite doubtful whether any of these questions are properly before the court. None of them appear from the bill of exceptions proper, and it is not clear that the court ought to go through a great mass of testimony attempted to be made a part of the bill of exceptions by mere reference to ascertain whether a positive and direct statement of a fact in the bill is erroneous. But however that may be, none of the questions proposed were sufficient to justify the motion. The proof is that the subscriptions to the capital stock are all genuine, and that all the subscribers have made a payment thereon, except one, and he refused solely because the contract between the defendant and the plaintiff was not being carried out. The subscription of the Honolulu Investment Co. was made by one purporting to be an officer of the corporation. The first assessment has been paid, and the subscription has never been repudiated. The defendant had knowledge thereof in October, 1901, when it was furnished a list of the subscribers, and again through the agent whom it sent to Honolulu to examine into the condition of affairs. Notwithstanding this knowledge, it made no objection to the subscription or its validity, and therefore it impliedly admitted its genuineness: *McCoy* v. *World's Columbian Expo.* 186 Ill. 356 (57 N. E. 1043, 78 Am. St. Rep. 288).

3. The charge that the money paid by the stockholders was not used by the corporation in accordance with the contract of subscription is controverted, but the defendant cannot refuse to

perform its contract on that account.   The question is one between the stockholders and the corporation, or between the corporation and its officers.   There is no provision in the contract between plaintiff and defendant that the money derived from the increased stock subscriptions should be kept intact.   When it was paid in, it became an asset of the corporation, and subject to its disposal.   If its officers have misapplied, wrongfully wasted or dissipated it, the defendant and the corporation are not without remedy, but it is no excuse for the defendant's refusal to abide by its agreement.

The judgment is reversed, and the cause remanded for a new trial.                                                REVERSED.