Argued October 1, 1924, modified as to Salem Fruit Union and reversed as to other defendants February 10, 1925.

THE PHEZ COMPANY *v.* SALEM FRUIT UNION

ET AL.

(233 Pac. 547.)

**Appeal and Error—Parties to Suit for Injunction Whose Demurrer to Complaint was Overruled on Appeal Held to have Right to Trial on Merits on Retrial.**

1. In suit by corporation against fruit growers' association and members thereof, where, on former appeal, demurrer of defendant growers to complaint was overruled and case remanded with directions to retry case as to them, as between association and plaintiff, growers, on retrial, were entitled to trial on merits.

**Contracts—Party Suing on Contract Alleged to have Been Made for His Benefit must Prove Such Allegation.**

2. In suit by buyer of fruit against fruit growers on contract executed between growers and their union, which was alleged to be for benefit of plaintiff, it was incumbent on plaintiff to prove that contract was made for its benefit.

**Contracts—To Enable Beneficiary to Sue, Contract must have Been Entered into for Its Benefit or He must be Party to Consideration.**

3. In order to enable person to sue on promise made for his benefit, although not party to contract, he must be party to con-

─────────

3. Contracts for benefit of third persons, see notes in 3 **Am. Dec.** 305; 9 **Am. Dec.** 155; 71 **Am. St. Rep.** 176.    See, also, 6 **R. C. L.** 882.

sideration or contract must have been entered into for his benefit; incidental benefit to him through performance not being sufficient.

**Contracts—Contract of Fruit Growers With Union Held not Made for Benefit of Purchaser of Fruit from Union.**

4. Where contract between fruit growers and their union was executed as authority for union to make new contract with purchaser of fruit, but such contract was never executed, such contract of growers with union was not made for benefit of purchaser, so as to be enforceable in action by it.

**Equity—Party Guilty of Sharp Practice in Obtaining Contract will not be Aided in Enforcing It.**

5. Where purchaser of fruit from growers' union, to secure new contract from growers through union, made false promises and misrepresentations, in suit by such purchaser against growers, purchaser, its assignee, and growers should be left in same place as they were.

**Evidence—Statute Relating to Varying Written Agreement by Parol Evidence Held not to Apply to Third Party, not Party to Contract.**

6. Section 713, Or. L., relating to varying written agreement by parol evidence, has not application in suit by purchaser of fruit against growers based on contract of growers with union, to which plaintiff was not party.

**Evidence—Competent for Fruit Growers Sued on Contract With Union to Explain Import of Contract.**

7. Where fruit growers were sued by purchaser of fruit from union of which they were members, and plaintiff relied on contract between growers and union as made for its benefit, it was competent for growers to explain import of such contract as contradicting allegations of plaintiff's complaint.

**Appeal and Error—Judgment on Former Appeal Overruling General Demurrer of Some Parties Defendant, and Remanding for Retrial, Held not Conclusive as Final Decree.**

8. In suit by purchaser of fruit from fruit growers' union, against growers, based on contract of growers with union, judgment on former appeal overruling general demurrer to complaint and remanding for retrial as between plaintiff and growers is not conclusive, regardless of failure of defendant growers to make application to plead over after overruling of demurrer; ruling upon such demurrer not having effect of final decree.

**Principal and Agent—Power of Agent to Bind Principal Rests upon Authority Conferred by Principal.**

9. Power of agent to bind principal rests upon authority conferred upon him for which principal either by act or conduct has become responsible, and without such authority the agent can bind only himself.

---

5. See 10 R. C. L. 389.
9. Authority of agent. See note in 16 Am. St. Rep. 493. See, also, 21 R. C. L. 853.

**Principal and Agent—When Principal not Bound by Act of Agent in Excess of Authority, Stated.**

10. Principal is not bound by act of agent in excess of authority if third person has knowledge of extent of agent's authority, or where facts and circumstances are such as to put him upon inquiry as to agent's authority and good faith.

**Principal and Agent—Generally, Person Dealing With Agent is put upon Inquiry as to Extent of Authority.**

11. As rule, person dealing with agent is put upon inquiry and must discover at peril that authority is in nature and extent sufficient to enable agent to do proposed act, and that source is traceable to will of alleged principal.

**Agriculture—Duty of Third Person Dealing With Fruit Union.**

12. Where third person such as purchaser of fruit deals with agent, such as growers' union acting for fruit growers, and where agent's authority is in writing and such third person has or is charged with knowledge thereof, he has duty to ascertain extent and nature of authority conferred, and whether agent is acting within scope thereof, unless excused from inspecting written authority by statement of principal defining such authority.

**Agriculture—Fruit Growers Held Liable to Purchaser from Union According to Contract of Growers With Union.**

13. Where fruit growers gave their union power of attorney authorizing it to sell fruit embraced in pool, containing provision that if grower withheld fruit he would pay specified sum as liquidated damages, growers, on failure to deliver to purchaser from union which knew of contract between growers and union, were liable only for damages stipulated in contract of growers with union.

**Appeal and Error—When Doctrine of Law of Case, Previously Appealed, Applies, Stated.**

14. Where, upon second appeal, the same state of facts is presented between same parties, decision of appellate court, or any point presented to and decided by it, becomes law of case; but such decision is not *res judicata* where evidence on issue is different nor as to persons not parties to first appeal.

**Appeal and Error—Decision on Former Appeal not Law of Case on Subsequent Appeal in View of Different Parties Concerned and Different Issues Raised.**

15. Where, on retrial after judgment on former appeal overruling demurrer of fruit growers, made codefendants with their union, which formed pool, defendant growers filed answer denying material allegations of complaint, raising new issues, and in which evidence differed widely from facts assumed to be true on ruling pertaining to demurrer, in view of fact that defendant growers were not parties to first appeal, and that interests of defendant union and growers were conflicting, decision on former appeal is not law of case, and is not final and binding as to such growers.

---

10. See 21 R. C. L. 854.
11. See 21 R. C. L. 853.
14. See 2 R. C. L. 223.

Appeal and Error—Decision on Prior Appeal Remanding Case for Another Trial is not Conclusive on Second Appeal, if Judgment was not Final and Conclusive.

16. Decision on prior appeal is not conclusive on second appeal, if former decision remanded case for another trial, and judgment itself was not final between parties and not conclusive.

Appeal and Error—Consideration of Evidence Relating to Rescission of Contract Between Fruit Growers' Union and Purchaser, as Affecting Case Between Purchaser and Growers Held Necessary.

17. In suit by purchaser of fruit against growers' union and individual growers to enforce contract to sell and deliver fruit to purchaser, considering testimony bearing upon allegation of rescission of contract between union and purchaser was necessary in so far as it affected defendant growers and other issues and equities of case; decision on former appeal overruling growers' demurrer to complaint being based upon facts different from those shown in evidence on retrial.

Specific Performance—Contract, to be Subject of Specific Performance, must Generally be Enforceable on Both Sides.

18. Although some contracts such as option contracts need not be enforceable on both sides by specific performance, the common contract to be specifically enforceable must be so on both sides.

Agriculture—Growers Signing Power of Attorney Authorizing Union to Sell Fruit Subject to Penalty Clause Held Liable to Purchaser from Union.

19. Where fruit grower signed contract with union giving it right to sell fruit produced by him, containing stipulation for liquidated damages if grower withheld fruit, on execution of contract by union with purchaser containing penalty clause, growers not released therefrom were liable to union for specified penalty for failure to deliver fruit.

Agriculture—Growers Executing Contract for Pooling Fruit Held not Liable for Failure to Deliver Fruit After Conveying Land.

20. Where fruit growers contracted with fruit union to form pool of fruit, and authorized it to sell such fruit as agent, with stipulation for penalty for withholding fruit, and annexed number of acres and estimated amount of fruit expected to be raised, on contract of union to sell purchaser fruit without specifying definite amount, growers who sold and conveyed land were released by union and were not liable to purchaser for failure to deliver fruit.

Agriculture—Judgment Against Fruit Growers Who did not Sign Pooling Contract Should be Reversed.

21. In suit by purchaser against fruit growers and their union based on contract with union for purchase of pool of fruit, judgment as against growers who did not sign contract making union agent to sell and dispose of fruit should be reversed.

---

16. See 2 R. C. L. 225.
18. See 25 R. C. L. 227.
19. See 6 R. C. L. 882.

From Marion: GEORGE G. BINGHAM and PERCY R. KELLY, Judges.

In Banc.

This is a suit for an injunction to restrain the defendant Salem Fruit Union from delivering to anyone, other than plaintiff, about 1,200 tons of loganberries, and that the Salem Fruit Union, and the several other defendants, who are designated as "growers," be required to specifically perform the contracts entered into on May 24, 1917, designated in the record as Exhibits "A" and "C." For a full statement of the issues between the plaintiff and the defendant, Salem Fruit Union, see the opinion of this court in *Phez Company* v. *Salem Fruit Union,* 103 Or. 514 (201 Pac. 222, 205 Pac. 970, 25 A. L. R. 1090).

A general outline of the history of the proceedings and matters involved is about as follows:

When the case was originally commenced the Salem Fruit Union appeared by its attorneys and filed a demurrer to plaintiff's complaint. The several defendant growers appeared separately and filed their demurrer to plaintiff's complaint. The trial court sustained the demurrer of the individual growers to the complaint, but overruled the demurrer on behalf of the Salem Fruit Union. An answer was filed by the Salem Fruit Union and a reply thereto by the plaintiff. The matter went to trial, as between the plaintiff and the Salem Fruit Union, upon the issue thus joined. Upon the evidence the court determined the issues of fact raised between the plaintiff and the Salem Fruit Union in favor of the defendant, made findings of fact and entered a decree dis-

missing the suit as against the Fruit Union and the several individual defendants.

Plaintiff appealed from the decree. This court reversed the decree of the Circuit Court and remanded the suit with directions, as shown in the latter part of the former opinion: (which was in substance embodied in the mandate).

"The order will therefore be that this cause be remanded with directions to overrule the demurrer as to all the defendants who signed exhibit 'C'; to permit plaintiff, if it be so advised, to file a supplemental complaint as to these defendants; to retry the case as to the growers and plaintiff, and as between the fruit union and plaintiff, so far as either shall desire to do so, leaving the testimony already taken to stand as between the union and the plaintiff; and otherwise to proceed as indicated herein."

After the case was remanded to the Circuit Court a supplemental complaint was filed by plaintiff, asking that the same relief be accorded for the years which had intervened during the time the suit was pending as prayed for in the plaintiff's original complaint. The several growers duly answered both the original and the supplemental complaints. The plaintiff replied thereto and the cause was heard by the Circuit Court. The trial court limited its inquiry to the question as to the number of tons of berries produced by the several defendants during the different years which the contract ran, the market value of berries for each of such years and assessed damages against the defendant, Salem Fruit Union, and the several defendant growers for the difference between the contract price and the market value of the berries found to have been grown by the defendant growers during the years covered by the contract.

The trial court refused to consider the evidence introduced by the growers, touching upon the question of misrepresentations and fraud, the rescission and abandonment of the contract, and other defenses interposed by the different growers.

In March and April, 1917, the Salem Fruit Union entered into contracts, in form designated as Exhibit "B" with the other defendant growers. This contract made general and specific provisions for the Salem Fruit Union to market the fruit raised by the several growers during the years 1917 to 1921, inclusive, and pay over to the growers the entire proceeds of the sale, after deducting expenses of handling, marketing and indebtedness, if any, due from the individual growers. Paragraph 7 of the contract reads thus:

"7. The Grower hereby appoints the Union his exclusive agent and hereby gives said Union an exclusive right to sell said fruit."

Paragraph 8 of the contract provided, in part, that the grower—

"in the event he withholds his fruit or any part thereof in contravention of this agreement, he will pay to the Union for each package of fruit so withheld as liquidated damages for such violation of his contract, the sum of ten cents (10¢) for each box of apples or pears, ten cents (10¢) for each crate of berries or cherries; five cents (5¢) for each crate or box of prunes or peaches, and for other varieties of fruit an amount in such proportion to above charge made for apples as the average market price of the fruit in question bears to the average market price of apples during the season in which the violation occurred."

The contract was to be in force from year to year until canceled by one of the parties on the first day

of March of any year on giving notice as therein prescribed.

Thereafter on May 24, 1917, the Union made a contract with the Northwest Fruit Products Company herein designated as the Northwest Company, which contract is known as Exhibit "A." This instrument provides for the sale by the Salem Fruit Union of about 1,200 tons of loganberries of the crops of 1917, 1918, 1919, 1920, and 1921 to the Northwest Company for three cents a pound for 1917 and $61.50 per ton for the remainder of the years mentioned, and contained sundry stipulations in respect to conditions of berries, containers, manner of delivery, etc.

Under contracts A and B the growers were free to withhold their berries by paying a small penalty, viz., ten cents per crate. Early in the winter of 1917–1918, owing to an unanticipated and unprecedented advance in the cost of labor and materials, due to the World War, it became evident to all concerned that loganberries could not be produced for three cents per pound. The growers would either stop producing berries, or they would produce the berries, sell them at the market price and pay the stipulated penalty. Neither course would enable the Northwest Company to carry on its operations. It required loganberries. It could not run on the penalties. Realizing these conditions, negotiations were opened between the officers of the Northwest Company and the Union, and a form of agency contract between the growers and the Union was prepared. The securing of the signatures of the growers to this new form of contract, which is designated in the record as Exhibit "C," was then undertaken. It is asserted by the defendant growers that the officers of the Northwest Company made certain representa-

tions and promises as to what the Company would do, and authorized the representatives of the Union to communicate these representations to the growers. A meeting was held, attended by officers of the two corporations and a large number of growers, at which the provisions of the new form of contract were presented to the growers, and sundry statements and promises were made to induce the growers to enter into the new agreement.

These representations are set forth in the answer of the growers and they allege substantially as follows:

In the early part of the year 1917, and prior to the execution of the contracts Exhibits "A" and "B;" the Salem Fruit Union proposed to each of the growers that a loganberry pool be formed, under which each of said growers should deliver to said Union all of the loganberries grown by him for a period of years upon certain premises, and that the Union sell the same to any purchaser it might select for the highest price obtainable, and submitted to said growers for execution by them, contracts in the form of Exhibit "B." It was represented to the growers that the officers of the Union, during the life of the pool, would be familiar with the market price of loganberries, crop conditions, the demand for loganberry products and the facilities for marketing the same, and by handling large quantities of berries in such pool, it would be able to obtain for the growers a price equal to, or in excess of, the current price and which would, under all the circumstances be the highest price obtainable. Said representations were so made to said growers with the intention that they should be believed and acted upon by said growers; and said growers each be-

lieved said reports and relied thereon and were each
induced thereby to consent to form such pool and to
execute said contracts in the form of Exhibit "B."

After the execution of Exhibit "B," the North-
west Company proposed to the Union that it and said
Union enter into a contract by which said entire pool
of loganberries should be delivered to said North-
west Company for each of said years, and that the
minimum price which said Northwest Company
should pay therefor, should be $61.50 per ton, repre-
senting a price of three cents per pound net to the
growers and a commission of $1.50 to said Union for
handling said pool. As an inducement for the con-
tract the Northwest Company represented that it
would enter upon a more extensive campaign for ad-
vertising loganberry products, which would cause the
market value and price of loganberries to advance
proportionately, and that as the same advanced the
Northwest Company would pay to said Union, for the
benefit of growers, additional amounts to be called
bonuses, which would cause said growers to receive
a net price which would approximate the market
price, and which would not in any event be less than
the cost of production, plus the reasonable profit to
the growers. Said representations were so made by
said Northwest Company with the intention that said
Union should communicate the same to said growers,
and with the intention that said growers and the
Union should believe the same and act thereon; and
the said Union did communicate the same to said
growers, and the growers and the Union did believe
the same and rely thereon and by reason thereof the
said Union was induced to execute the contract of
which said Exhibit "A" is a copy. After the execu-
tion of Exhibit "A" the Northwest Company re-
peated said representations and promises to the

Union and agreed with the Union to make good its said representations and to construe and carry out said contract in accordance with said promises.

After the execution of Exhibit "A" the Union, relying on its said agreements and mutual understanding with the Northwest Company, represented to each of said growers that it had entered into a contract with said Northwest Company for the sale of said pool of loganberries during said years, by which said contract and supplementary agreements said Union could make good its representations to said growers at the time of the formation of said pool, and under which said contract and supplementary agreements the Northwest Company was obliged to pay for said berries a price which would net to the growers three cents per pound and which would be increased from year to year by additional payments in the form of bonuses as the demand for and market price of said berries increased; and that such price would approximate the market price of said berries and would not, in any event, be less than the cost of production plus a reasonable profit to said growers; and the said growers believed said representations and relied thereon and were induced thereby to consent to the disposal of said pool under said agreements and to grow and deliver to said Northwest Company their berries for the year 1917.

About January, 1918, all the contracts in the form of Exhibit "B," which had been signed by these answering defendants were, by mutual consent of the parties to the same canceled and rescinded. At that time said Union proposed to said growers that they execute a power of attorney, in the form of Exhibit "C," appointing said Union the agent of said growers with authority to enter into a new contract

with said Northwest Company for the sale to the latter of the berries to be grown by such growers for the years 1918 to 1921, inclusive, at a minimum price of three and one-half cents per pound net to said growers; and at the time the Union represented to each of said growers that if he would so execute said contract said Union would under the authority so granted, enter into a new contract with the Northwest Company which would obligate the latter to carry out its said previous representations and promises to the Union as heretofore alleged and under which said authorized contract each of said growers would receive a minimum price of three and one-half cents net to him, and as the demand and market price for berries advanced and the cost of production increased, additional sums in the way of bonuses should be paid to such growers which, together with said minimum price, would approximately equal the current market price of berries during said years, and would not in any event be less than the cost of production plus a reasonable profit to said growers; and the said Northwest Company, to induce said Union to make said representations and promises to said growers, represented to said Union that it was able to and actually would do as said Union had represented to said growers that it, the Northwest Company would do; and said Union believed said representations and relied thereon and was induced thereby to so represent said matters to said growers and to execute said contracts in the form of Exhibit "C." Said representations to said growers were so made with the intention that they be believed and acted upon by the growers, and said growers who signed said Exhibit "C" did so believe them and relied thereon and were induced thereby to

execute said contracts in the form of Exhibit "C." Said contracts were not intended by either of the parties to operate as a contract of sale, but the same were executed and delivered to the Union with the express understanding that their only effect was to appoint said Union the agent of said growers to execute a future contract with said Northwest Company, to embody the conditions which said Union had represented to said growers, would be incorporated therein, and to continue such other provisions as the Union in its judgment deemed necessary or proper for the protection of the interests of said growers.

Thereafter the Union in good faith attempted to enter into a contract with the Northwest Company, as it had been authorized by the growers to do, and negotiations for that purpose continued during the remainder of the year 1918 and the early part of the year 1919, but said parties were unable to agree upon the terms of such a contract. During the whole of such negotiations the Northwest Company recognized and agreed with said Union that under the former pooling agreement and under the proposed new agreement it was obligated to pay, in addition to the mentioned price specified in the growers' contracts, additional sums in the form of bonuses to the extent theretofore by it represented that it would pay.

While such negotiations were pending the 1918 crop of berries came on for harvest and delivery. At that time it was agreed between said growers and the Union and the Northwest Company that said growers should deliver said crops to said Northwest Company who should pay therefor the minimum price of three and one-half cents per pound to the grower

and $1.50 per ton to the Union, and at the end of the season such additional amount as market conditions warranted (such conditions being those theretofore discussed by the parties and hereinbefore mentioned) and under said agreement said berries for that year were delivered to the Northwest Company, for which that company paid the minimum price of three and one-half cents per pound to said growers. Later said Northwest Company agreed with the Union and the growers that the conditions mentioned warranted the payment of an additional one-fourth cents per pound to each of the growers and agreed to pay the same forthwith, but has ever since failed to pay the same or any part thereof.

It is further alleged in the answer of the growers thus: During the early summer of 1919 it was evident to all parties interested in said contracts that the cost of production for that year would be in excess of five cents per pound, and that to enable said growers to receive a reasonable profit in addition to the cost of production under the then existing conditions, a price from seven to nine cents per pound should be paid to the growers, but the plaintiff then announced that neither it nor said Northwest Company would be bound by either of said representations or agreements which either of said companies had so made to and with the Union and the growers, excepting only Exhibit "A" which plaintiff then asserted was still in effect and all of said agreements, representations and promises, except said Exhibit "A," were then expressly repudiated by each of said companies, and an arbitrary demand was made by plaintiff upon the Union and growers to deliver said berries of that year at three cents per pound and they refused to pay any price in excess

thereof; and in view thereof the growers who had signed contracts in the form of Exhibit "C" thereupon, with the consent of the Union, revoked and withdrew all authority of said Union under Exhibit "C" and rescinded the same.

The cost to said growers to produce said berries during the year 1919 was from five to seven cents per pound, during 1920 from six to ten cents, during 1921 from three and one-half cents to six cents per pound. The market price for said berries did not, during any of such years, exceed the cost of production plus a reasonable profit to said growers. Plaintiff did not, during either of the years of 1920 or 1921 pay or tender to the Union or the growers any amount in excess of three and one-half cents per pound.

By reason of the matters herein mentioned, plaintiff and its assignors have not done or offered to do equity in said transactions, and to now permit plaintiff to require delivery of said berries at three and one-half cents per pound or damages for nondelivery, is to permit plaintiff to assume a position and to construe said agreements contrary to the clear intent of all the parties thereto, and to permit it to falsify each of the material representations and promises inducing the formation and continuation of said loganberry pool, and to enable plaintiff to use the powers of a court of equity to consummate an actual fraud upon defendants, "and while it is not physically possessed of hands which a chancellor could classify as unclean, in point of fact its corporate tentacles are slimy."

In the sixth and separate answers of the growers, it is alleged in part thus: At the time the writing designated as Exhibit "C" was presented to the

defendant growers for their signatures, it was expressly represented that said Exhibit "C" provided only for the picking and marketing of such loganberries as the defendant growers, after the date of Exhibit "C," might themselves grow, pick and market from the particular parcels of land therein referred to, and there was pointed out in said Exhibit "C" a provision that the same should run with the land upon which said berries should be raised, and it was then and there represented by the Salem Fruit Union, acting for and on behalf of the plaintiff and its predecessor, and with their knowledge, acquiescence and consent, that the provisions of said Exhibit "C" should be limited to such berries as might be actually produced by said defendant growers from said lands referred to in said instrument; and that the provision that the said agreement should run with the land was inserted therein so that should said growers sell such land they should not be obligated to provide any loganberries for said pooling agreement or under Exhibit "C," and it was not contemplated or intended that the persons who signed Exhibit "C" would be obligated to procure or purchase loganberries for said pooling agreement or for the plaintiff, or its predecessor. It was then and there known, contemplated and understood that said growers, or any of them, might at any time sell or dispose of their lands upon which loganberries were then growing, and in the event any of said growers should sell their loganberries, or lands, it was never intended that they should furnish loganberries to the Salem Fruit Union, or plaintiff or its predecessor; that the growers in signing Exhibit "C," relied upon such construction and the representations as to its legal effect, and said representations and agreements

were material inducements to said growers in signing said instrument and were so intended by the parties making the same.

In reliance upon said representations and agreements and upon the practical construction of Exhibit "C," several defendants, named in the answer, on different dates sold and conveyed the lands referred to in said writings, designated as Exhibits "B" and "C," and since such sales have ceased to grow loganberries, and by reason of the premises, the plaintiff is estopped from alleging or asserting that any of said defendants were obligated in any manner on their contracts after the sale of their lands.

In their seventh separate answer the growers allege, since the making of the contracts, designated herein as Exhibit "B," each of the defendants, L. P. Hopkins, O. B. Miles, H. H. Rideway, George Bayer, C. T. Gordon, J. F. Groves, S. A. Mize and H. Neuens has died.

Such growers as were not present at the meeting were visited by a representative of the Union and on the strength of the representations made at the meeting, which were repeated to them, the majority were persuaded to sign Exhibit "C." The material allegations of the answer of the growers were put in issue by a reply.

After the signatures of some eighty-eight growers had been secured, the representatives of the two corporations undertook to make a contract for the sale of the berries of the growers, pursuant to the authorization conferred by the growers upon the Union, under Exhibit "C," forms of a proposed contract were prepared and transmitted, but no actual agreement was reached and no contract was signed.

In May, 1919, the Northwest Company assigned to the plaintiff, The Phez Company, all its claims under

the original contract of May 24, 1917, Exhibit "A," and by letter dated May 27, 1919, directed to Salem Fruit Union, the Phez Company gave notice that the agreement, designated as Exhibit "A" "is in full force and effect, and that our Company will expect full performance of this agreement by delivery to us of the crops for the years 1919, 1920 and 1921, in accordance with the strict terms thereof." The plaintiff made this contention in the original complaint, and also by the testimony of its officers upon the trial. The plaintiff in its amended complaint does not specifically ask judgment for damages against the growers.

MODIFIED AS TO SALEM FRUIT UNION.    REVERSED AS TO OTHER DEFENDANTS.

For appellants there was a brief over the name of *Messrs. Smith & Shields,* with oral arguments by *Mr. Oscar Hayter, Mr. Alfred A. Hampson, Mr. Charles A. Hardy* and *Mr. Roy F. Shields.*

For respondent there was a brief and oral arguments by *Mr. John H. McNary, Mr. William H. Trindle* and *Mr. W. C. Winslow.*

BEAN, J.—The growers contend that their defenses upon this appeal is the first time that matter has been tried; that the representations made by the plaintiff and the Salem Fruit Union, and by means of which the contracts Exhibit "C" with the growers were procured, were material inducements and the respective defenses based thereon, are sufficient to defeat recovery on the part of the plaintiff. No findings of fact were made by the trial court in regard to the defense of the growers.

1. It is alleged in plaintiff's reply to the answer of the defendant growers that the mandate of this court sent to the trial court—

"provided that said cause be remanded to the Circuit Court solely for the purpose of taking an accounting with said defendants as to the amount of berries grown for the different years, the prices obtained therefor and ascertaining the amount of damages suffered by plaintiff because of the breach of said contracts on the part of said defendants. Said mandate further provided that said Circuit Court should enter a final decree herein not inconsistent with the opinion of the Supreme Court rendered herein, and that by said opinion and said decree entered by said court and said mandate all of the matters and things attempted to be alleged and set forth in all of the several defenses or pretended defenses of all of said several answers of said defendants herein referred to, have been litigated and determined."

Considering the appeal of the defendant growers, it is first necessary to notice the import of the opinion upon the former appeal in overruling the demurrer to the complaint interposed by the defendant growers. Turning to page 535 of 103 Or. (201 Pac. 229, 25 A. L. R. 1090), we notice that it is held that "the court should retain the case, and if the allegations of the complaint and the supplemental complaint are found to be true, it should compel the defaulting parties to make good in damages." Again, on page 546 of the report (201 Pac. 232), the court said: "But taking the allegations of the complaint to be true, the growers who signed Exhibit 'C' should account to plaintiff," and the conclusion of the opinion upon which the mandate sent down in the case is based, reads thus:

"The order will therefore be that this cause be remanded with directions to overrule the demurrer

as to all the defendants who signed Exhibit 'C';
to permit plaintiff, if it be so advised, to file a sup-
plemental complaint as to these defendants; to retry
the case as to the growers and plaintiff, and as be-
tween the fruit union and plaintiff, so far as either
shall desire to do so, leaving the testimony already
taken to stand as between the union and the plaintiff;
and otherwise to proceed as indicated herein.''

The whole opinion as to the demurrer of the
growers, in so far as future proceedings are out-
lined, has its foundation upon the condition that the
complaint is found to be true, and therefore, of
course, that the equities are with the plaintiff. The
former opinion specifically directs that the issues be-
tween the growers and the plaintiff be tried. This,
of course, contemplated that the defendant growers
would file an answer, which they did.

The growers never having had a trial of the cause
upon its merits, and the former opinion being couched
in plain language, we fail to see how the learned
counsel for plaintiff can so read the opinion and the
mandate based thereon, as to preclude the defendant
growers from having such a trial. So far as the rec-
ord discloses such was the final view of the trial court
after taking the testimony.

2. All of the rights of the plaintiff as against the
growers, in so far as the contract Exhibit ''C'' is
concerned, are based upon the allegations of the com-
plaint to the effect that the growers' contract Exhibit
''C'' was made to enable the Union to deliver under
the then existing contract Exhibit ''A'' between the
Union and the Northwest Company, and that such
contract Exhibit ''C'' was executed between the de-
fendant growers and the Union ''for the express
benefit of plaintiff.'' These allegations and many
other allegations of the complaint, are denied by the

113 Or.—27

defendant growers. These allegations were absolutely essential in stating a cause of suit against the growers and were the most vital part of the complaint, in fixing a basis for the liability of the growers to the plaintiff. For the purposes of the demurrer to the amended complaint these allegations were assumed to be true. Necessarily it was upon such assumption that the opinion in regard to the demurrer was pronounced. It was incumbent upon the plaintiff to prove such allegations. Upon the trial of the issue between the plaintiff and the growers, the testimony, upon the part of both the plaintiff and the defendant growers overwhelmingly shows that the contract Exhibit "C" was not made for the benefit of plaintiff or its assignors, that neither the growers, the Union, nor the plaintiff, or its predecessor, ever intended or construed the contract Exhibit "C" either as an aid to Exhibit "A" or as an instrument creating any direct privity between the plaintiff, or its predecessor, and the growers but that contract Exhibit "C" was entered into for the purpose of authorizing the Union to make a new contract with the Northwest Company in order to make provisions for the changed conditions in the production of berries, that is, to so arrange that upon the one hand the berries would be delivered to the Northwest Company, or its successor, and on the other, that the growers might receive an increased price for their berries, somewhat in proportion to the high cost of production without resorting to the application of the ten cent per crate penalty clause.

3. According to the weight of authority in order that a person may maintain a suit on a promise made for his benefit, although not a party to the contract, he must be a party to the consideration, or the con-

tract must have been entered into for his benefit. The action cannot be maintained merely because the third person will be incidentally benefited by the performance of the contract: 13 C. J. 709, § 817 (c); *Turnham* v. *Calumet & Ore. M. Co.*, 58 Or. 453 (112 Pac. 711, 115 Pac. 157); *Washburn* v. *Interstate Invest. Co.*, 26 Or. 436 (36 Pac. 533, 38 Pac. 620); *Parker* v. *Jeffery*, 26 Or. 186 (37 Pac. 712); *Rohr* v. *Baker*, 13 Or. 350 (10 Pac. 627). The text of 13 C. J. from which the last statement of the rule is taken in substance, is supported by numerous citations of authority from the federal courts and from nearly every state in the Union, including the cases in this state above cited. In *Washburn* v. *Investment Co., supra,* the rule is stated by former Justice BEAN at page 441 of 26 Or. (38 Pac. 621), thus:

"The prevailing doctrine in this country undoubtedly is that, where one person, as a consideration or part consideration for an *executed* contract, promises another, for a consideration moving from him, to pay or discharge some legal obligation or some debt due from such other to a third person, the latter, although a stranger to the consideration, and not an immediate party to the contract, may maintain an action thereon, *if it was made directly and primarily for his benefit.* And this, we think is all that has in fact been held by the former decisions of this court in which such actions have been sustained, although the language of some of the decisions states the rule without qualification that where one person makes a promise to another for the benefit of a third the latter may maintain an action thereon: *Baker* v. *Eglin,* 11 Or. 333 (8 Pac. 280); *Hughes* v. *Oregon Railway & Nav. Company,* 11 Or. 437 (5 Pac. 206); *Schneider* v. *White,* 12 Or. 503 (8 Pac. 652); *Chrisman* v. *State Insurance Company,* 16 Or. 283 (18 Pac. 466)." (Italics ours.)

At page 442 of the same report (38 Pac. 621), we read:

"After a somewhat exhaustive examination of the question, we have found no case which has gone so far as to hold that such action can be maintained on an executory contract by which one person promises to advance his own money to pay the debts of another, but, on the contrary, the authorities deny the application of the rule to such a contract: *Garnsey* v. *Rogers,* 47 N. Y. 233 (7 Am. Rep. 470); *Second National Bank* v. *Grand Lodge,* 98 U. S. 123 (25 L. Ed. 75, see, also, Rose's U. S. Notes); *Pardee* v. *Treat,* 82 N. Y. 385; *Berry* v. *Brown,* 107 N. Y. 659 (14 N. E. 289).

In 13 C. J. 709, note 29, and cases there cited, it is stated thus:

"It is not enough that the contract may operate to his benefit. It must appear that the parties intend to recognize him as the primary party in interest and as privy to the promise."

4. "To entitle him to an action" said Mr. Justice Rapallo in *Garnsey* v. *Rogers,* 47 N. Y. 233, "the contract must have been made for his benefit." "He must be the party intended to be benefited." *Montgomery* v. *Rief,* 15 Utah, 495, 501 (50 Pac. 623, 625). Therefore it was doubtless essential in the present case, that the plaintiff prove the allegation of its complaint to the effect that the contract Exhibit "C" was entered into between the growers and the Union for the benefit of plaintiff's assignor. The testimony, on the part of the growers, is to the effect that the contract, Exhibit "C" was executed as authority for the Union to make a new contract; although a new contract was prepared and was the subject of negotiations between the Northwest Com-

pany and the Union for nearly a year, it was never completed or executed.

The record shows that during the latter part of the year 1917 and all during the season of 1918, an endeavor was made by the officers of the Union, as the agent of the growers, and the officers of the Northwest Company to agree upon a new contract, and two or three drafts of contract were made and discussed by the officers of the two corporations, but as stated, they never got together. Their· minds never met on the proposition and the contract was never executed. One objection on the part of the manager of the Northwest Company, after some eighty-eight growers had signed the contract Exhibit "C," was that these growers were mostly the same ones who had signed Exhibit "B" and the Northwest Company was not, according to the new arrangements, getting any more berries, that is, were not getting the required 1,500 tons instead of about 1,200 tons of berries, as provided by the old contract Exhibit "A"; and the officer of the Northwest Company said in substance: "Why should we sign a new contract at three and one-half cents per pound for berries when we already have a contract for practically the same amount at three cents per pound" (see Trans. of Ev. 533), the price specified in Exhibit "A."

Mr. Frank Schmidt, the then manager of the Northwest Company, in detailing the circumstances in relation to the negotiations in an attempt to make a new contract, testified in substance, in answer to the question—"Why were you interested in a new contract with the Union?" answered, "I was worried about more tonnage." "I told Paulus if they did not get us more berries, we could get them ourselves." Upon cross-examination Mr. Frank Schmidt

further testified to the effect, "If we could have gotten the 1500 tons, see, we would have signed a contract to cover the total at three and one-half cents a pound. When Mr. Paulus came back, he said, 'I have signed 88 growers; that was no more than we had before; now, why should we sign a contract with the same growers,' as I remember it, he says it was the same growers, ready to sign, at three and a half cents. I says, 'Why should we sign, we have those on the three cent contract, where does the compensation come in at, there was one signed, wasn't there? * * '"

"Q. Well, this second contract between the grower and the Fruit Union, that you never were interested in, or considered as far as your company was concerned, at all?

"A. No, I told Mr. Paulus when he mentioned that at the time, I told him we would hold the Union.

"Q. You didn't consider it was for your benefit or you didn't care anything about it, but you were looking to the Union?

"A. Looking to the Union, sure." (Trans. of Ev. 554.)

Mr. Frederick Schmidt, brother of Frank Schmidt, one of the board of directors of the Northwest Company, testified to the effect that he moved from Olympia to Salem in January, 1918, and was actively connected with this company from that time on. About that time the Phez Company succeeded the Northwest Company. Frederick Schmidt became general manager of the concern in January, 1919. Prior to that time he was taking care of part of the business under instructions from the directors as assistant secretary with no authority to close contracts but to submit them to the directors. That about the time Exhibit "C" was signed, two or three

drafts of contract proposed to be executed between the Northwest Company and the Union were made; that he went with Mr. Paulus to the office of an attorney in regard to the proposed contract but that nothing definite was accomplished. After this, controversy arose and on May 27, 1919, the plaintiff stated its position in a letter of that date, which reads thus:

"May 27, '19.

"Salem Fruit Union,
"Salem, Oregon.
"Gentlemen:—
"Attention—Mr. Frank Gibson:
"Replying to your communication of May 22d, 1919, concerning a contract entered into between the Northwest Fruit Products Company and yourself, for the delivery of certain Loganberries for the years 1917, 1918, 1919, 1920 and 1921, we will state that this agreement is in full force and effect, and that our company will expect full performance of this agreement by delivery to us of the crops for the years 1919, 1920 and 1921, in accordance with the strict terms thereof.

"It is true that we paid you a bonus upon the crops that were delivered for the year 1918, which was done without any consideration from you, but for the purpose of enabling the growers to meet the increased cost of production. We further agreed to accept from you as a compromise under this agreement for the year 1918 only, ten cents per crate for the berries which your growers refused to deliver to you under their contract with your company, known as the 1916 pool agreement, but reserved the right to collect such damages as we would be entitled to under our contract against you for your failure to deliver to us the berries grown by your members who signed your pooling agreement for the year 1917. Those settlements or compromises applied to the 1918 crop only.

"You are, therefore, notified that we will expect a delivery in the future from you of all berries as provided in our contract, dated the 24th day of May, 1917.

"Yours very truly,

"The Phez Company.

"By ————————.

"(Sgnd.)  Frank T. Schmidt,

"Vice-President."

This letter, by the date in the last part thereof, refers to contract Exhibit "A" requiring the Union to deliver berries at three cents per pound. This was more than a year after the contracts in the form of Exhibit "C" had been executed by the growers, and it appears from the letter that there was no thought then of the plaintiff claiming any benefit from the contract Exhibit "C" or of plaintiff being willing to accept the terms thereof and pay the increased price of three and one-half cents. Plaintiff or its assignee never, prior to this suit, accepted Exhibit "C," nor at any time agreed to pay the price contained therein for the year mentioned.

The position of the growers as to the proposed contract seems to have been as follows: contract Exhibit "B," between the growers and the Union which authorized the Union to act as the agent of the growers and sell their berries, which the Union apparently attempted to carry out by the execution of the contract with the Northwest Company, Exhibit "A," contained the following paragraph:

"The Grower hereby appoints the Union his exclusive agent and hereby gives said Union an exclusive right to sell said fruit."

It also contains a penalty clause to the effect that if the grower should fail to deliver his fruit in contravention of the agreement, he will pay the Union

for each package of fruit so withheld as liquidated damages for such violation of his contract, the sum of ten cents per crate of berries, provided that the contract might be canceled by either of the parties on the first day of March of any year after March 1st, 1922.

During the early part of the year 1918, the cost of raising the berries had increased and the price of berries had advanced, and the penalty clause contained in Exhibit "B" was a means by which the grower could take advantage of the changed conditions by paying the penalty, and some of the growers availed themselves of such privilege. The Union, as agent for the growers, was therefore unwilling to sign the new contract at three and one-half cents per pound without a penalty clause or some provision for increased cost of production and an increase in price. A penalty clause of this kind is well known to be common in co-operative marketing, contracts; and some such stipulation was expected to be made in the new contract contemplated between the Union as the agent of the growers and the Northwest Company. The main reason why the new contract was not signed appears to have been that it was never made or the terms thereof agreed upon.

After the Northwest Company and its successor the Phez Company had endeavored for about a year to obtain the new contract between itself and the Union, the agent of the growers, and failed, then the plaintiff took the position that the contract Exhibit "C" was executed for its benefit, and that the execution of the new contract was unnecessary. The position taken by the plaintiff is tantamount to an effort to have the court make a new contract with it and the Union so as to bind the growers. It is a difficult

task for the court, either by an opinion, decree or judgment to make a contract for parties who have tried to make one and failed.

The attempt of the Northwest Company to obtain a contract from the growers through their agent the Union so as to eliminate the provision contained in permitting a grower to withdraw from the pool and pay the penalty of ten cents per crate, as liquidated damages in order to pay the overhead expenses of the Union, without provisions for any change in the conditions or cost of production, or any provision, in order that the grower could change his position or withdraw from the pool, was made by misrepresentations and promises, by which it was not intended the Northwest Company should be bound, or should be carried out. The attempted transaction is not one that is favored by a court of equity. The growers were willing to trust their agent, the Union, and relied upon it to protect their interest. They were not, however, willing to be bound to the Northwest Company and never intended to execute contract Exhibit "C" for the benefit of the Northwest Company or its successor or for any purpose, other than to authorize the Union to sell their berries as their agent, or in short, as a power of attorney.

5. This is shown by the testimony upon the trial between plaintiff and the growers. A court of equity should leave the growers and the Northwest Company and its assignee in the same place they were when the Company attempted by using and coercing the Union to overreach the growers and obtain an unfair contract by the means indicated.

6. Plaintiff invokes the rule excluding parol evidence embodied in Section 713, Or. L., which reads thus:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing," with certain exceptions not applicable here.

Neither plaintiff nor its predecessor was a party to the contract Exhibit "C." As between the growers, who were parties to the contract Exhibit "C" and the plaintiff a stranger to the contract, who is not bound by it, the rule has no application: 22 C. J. 1292, § 1725; *Pacific Biscuit Co.* v. *Dugger,* 42 Or. 513 (70 Pac. 523); *Smith* v. *Farmers' & Mer. National Bank,* 57 Or. 82 (110 Pac. 410); *Robison* v. *Oregon-W. R. & N. Co.,* 90 Or. 490 (176 Pac. 594); *Bagley Co.* v. *International H. Co.,* 99 Or. 519–521 (195 Pac. 348).

7. It was competent, under the circumstances of the case for the growers to explain the import of the contract Exhibit "C." In this they were merely contradicting the allegations of plaintiff's complaint. The testimony did not contradict or vary the terms of the contract in this respect.

8. In regard to this testimony pertaining to contract Exhibit "C" the plaintiff contends that the judgment or decree rendered by this court directing the judgment overruling the general demurrer "is as conclusive of the matters and things therein confessed as a verdict finding the same facts to be true, and the facts so established can never thereafter be contested between the same parties or their privies"; that the decision upon the demurrer disposed of the case on its merits and determines the rights of the parties, that such would be the case except where

there is an application made by the defendant growers to "plead over" after the overruling of their demurrer. With this contention we are unable to agree. The defendant growers in conformity with the spirit of the former opinion of this court, if not the letter thereof, filed an answer, putting in issue many of the material allegations of the complaint, and stating further and separate defenses. No objection was made by plaintiff to such answer.

A reply thereto was filed and testimony was taken upon the issues thereby raised. The ruling upon the demurrer therefore never had the effect of a final decree. Whether application was made to the court below or not for the filing of the answer, that court permitted it to be filed.

It is contended on the part of plaintiff that the decision of the court upon the former appeal is "the law of the case" and that it is final and binding as to the suit of plaintiff against the defendant growers, particularly as to the alleged rescission of the contract Exhibit "A" between the defendant Union and the assignor of plaintiff, the Northwest Company.

Before taking up this question in detail it is helpful to an understanding, that we further notice the situation of the parties. This is a triangular suit. The plaintiff maintaining one point of the angle, the Fruit Union another, and the defendant growers the third.

It is practically conceded that as between the plaintiff and the Salem Fruit Union, the former decision, as to the main question in suit, is "the law in the case." As between the plaintiff and the defendant growers, it is shown and settled that in the transaction involved therein the Union acted as the agent of the defendant growers.

9–11. It is a fundamental principle of the law of agency that the power of every agent to bind his principal rests upon the authority conferred upon him by that principal. Without this authority for which the principal himself, either by act or conduct, has become responsible, the agent can bind only himself: 2 C. J. 560, § 202. A principal will not be bound by an act of his agent in excess of his actual authority, where the third person has knowledge of the extent of the agent's authority, or where the facts and circumstances of the case are such as to put him upon inquiry as to the authority and good faith of the agent, as where a third person deals with an agent who is acting for himself as well as for his principal in the transaction, as such a person is chargeable with a knowledge of such facts as a proper inquiry as to the agent's powers would have revealed to him: 2 C. J. 561, § 203. As a general rule every person who undertakes to deal with an alleged agent is put upon inquiry, and must discover at his own peril that it is in its nature and extent sufficient to permit the agent to do the proposed act, and that its source is traceable to the will of the alleged principal: 2 C. J. 562, § 204.

12. Where a third person, like the Northwest Company, deals with an agent, such as the Fruit Union, and where the authority of the agent is in writing, and such third person has, or is charged with knowledge thereof, it is his duty to ascertain the nature and extent of the authority conferred, and whether the agent is acting within its scope unless he is excused from inspecting the written authority by a statement from the principal himself, defining such authority: 2 C. J. 565, § 207.

13. In the case at bar the authority of the Salem Fruit Union to sell the berries of the growers, which

they had placed in the pool in 1917 was given by the
individual growers in writing couched in the language
embraced in Exhibit "B." The Northwest Products
Company knew, or had good reason to know that such
authority of the Union was in writing. It was well
known by the Northwest Company from what source
the Union were to obtain the berries and it appears
from the record that the Northwest Company knew
all about the execution, and provisions of Exhibit
"B." The power of attorney, Exhibit "B," from
the growers to the Fruit Union, authorizing it to sell
the berries embraced in the pool, contained the fol-
lowing important provision:

"Whereas the Union must provide for the pay-
ment of certain overhead expenses and fixed charges
and must expend such sums as are necessary to keep
in touch with crop and market conditions and must
provide warehouse and storage facilities in propor-
tion to the tonnage contracted; and whereas, such ex-
penses should be prorated over all of the fruit con-
tracted to be sold, the Grower, therefore agrees that
in the event he withholds his fruit or any part
thereof in contravention of this agreement, he will
pay to the Union for each package of fruit so with-
held as liquidated damages for such violation of his
contract, the sum of ten cents (10¢) for each box of
apples or pears, ten cents (10¢) for each crate of
berries or cherries; five cents (5¢) for each crate or
box of prunes or peaches, and for other varieties of
fruit an amount in such proportion to above charge
made for apples as the average market price of the
fruit in question bears to the average market price
of the apples during the season in which the viola-
tion occurred."

It is clear that the Union was not authorized to
make a contract with the Northwest Company for
the absolute sale of the berries without any regard to
the paragraph in the power of attorney, Exhibit "B"

relating to the penalty for failure to deliver berries, or so as to prevent a grower from canceling the contract Exhibit ''B'' according to its terms.

If the Union so desired it was competent for it to bind itself, although it was authorized to make a certain kind of contract on behalf of the growers: Williston on Cont., § 282, note.

Therefore, as we view the case, if the contract Exhibit ''B'' was not abrogated or modified by the parties, in the event of failure on the part of the growers to deliver fruit contracted for the years mentioned in Exhibit ''A,'' they would be liable for damages as stipulated in their contract Exhibit ''B,'' namely, ten cents per crate for all berries which they failed to deliver.

14, 15. Referring again to the question of *res judicata,* it is well settled that where upon a second appeal the same state of facts, presented between the same parties, a decision of the appellate court upon any point presented to and decided by it, becomes the law of the case. Such a decision is not *res judicata* where the evidence upon the issue is different, nor is it *res judicata* as to persons not parties to the first appeal. Since this case was here upon the former appeal, the defendant growers have filed an answer herein denying the material allegations of the complaint raising new issues, and over 500 pages of testimony has been taken that was not before the court or considered upon the former appeal. All of the evidence to which we have referred or quoted above was produced upon the trial of the case between the plaintiff and the defendant growers, and was not before the court upon the former appeal. The evidence differs widely from the facts assumed to be true upon the ruling pertaining to the demurrer upon the first

appeal. The appellant growers were not parties to the first appeal. The interests of the fruit Union and of the defendant growers are conflicting. It was to the advantage of the Union that the contract Exhibit "C" be signed by the growers and considered as supplemental to or supporting or modifying contract Exhibit "A" between the Union and the Northwest Company. Or in other words, to eliminate the penalty clause contained in Exhibit "B." The Union in executing Exhibit "A" was acting for itself as a broker, as well as for the growers. It was more than an agent. Exhibit "A" did not contain the penalty clause. The Northwest Company threatened to hold the Union to a full compliance with the terms of the contract Exhibit "A" by the delivery of about 1,200 tons of berries whether the growers delivered that amount under contract Exhibit "B" or failed to deliver the berries and pay the ten cents penalty. Surely the defendant growers should not by any kind of logic be bound without a trial, by a proceeding between two parties, both of whose interest conflicts with that of these appellant growers.

The doctrine of the law of the case is confined to a previous decision between the same parties where the same state of facts is subsequently presented. This is shown by the case of *Murphy* v. *City of Albina,* 22 Or. 106, where Mr. Justice R. S. Bean, at page 110 of the Report (29 Pac. 353, 355, 29 Am. St. Rep. 578), states thus:

"It was argued that the act of the individual members of the council in assenting to the change of the grade and directing the plaintiff to complete the work according to the instructions of the surveyor is binding upon the defendant, and the opinion upon the former appeal is relied on as the law of this case. As to every point presented and decided by this court

in the former case, the decision becomes the law of the case, binding upon both the parties and this court so far as the same state of facts is substantially presented, but no further.''

In the case of *Portland Trust Co.* v. *Coulter,* 23 Or. 131, 133 (31 Pac. 280, 282), the same learned Justice records the following language:

''Counsel for appellants now earnestly insists, in an able and learned argument, that the decision in *Coulter* v. *Portland Trust Co.,* ought to be revised, and many cogent reasons are suggested in support of this contention. If this was an open question on this appeal, we might feel induced, in view of counsel's argument, to carefully re-examine the question; but the law is well settled that a decision of this court upon a point distinctly made becomes, in all subsequent proceedings between the same parties, concerning the same subject matter, and upon the same facts, the law of the case by which we are bound whatever our views might be upon an original consideration of the matter.''

In the case of *Pacific Mill Co.* v. *Inman,* 50 Or. 22, 26 (90 Pac. 1099), the court refused to apply the doctrine of a previous decision becoming the law of the case because of the fact that evidence was admitted in the former trial which was excluded in the second. At page 26 of the Report (90 Pac. 1101), we find as follows:

''As to the motion for nonsuit, counsel for plaintiff insists that the question of the *prima facie* sufficiency of plaintiff's evidence is *res judicata,* a former nonsuit having been granted and the judgment thereon reversed on appeal: (46 Or. 352, 80 Pac. 424). But for the purpose of this argument counsel assumes that it is disclosed in this record that the evidence on this trial is the same as on the former, which assumption is not justified by the record. At the former hearing in this court it was conceded that

113 Or.—28

plaintiff introduced evidence tending to prove all the allegations of the complaint, except as to the sufficiency of the stock subscription, and that was the only ground assigned for the nonsuit, while on this trial it is claimed there was no evidence as to the increase of the capital stock, and that is the assignment for nonsuit now: *Palmer* v. *Publishing Co.*, 90 Cal. 168 (27 Pac. 21.) The issues have been changed by an amended answer. Much evidence that was admitted in the former trial was excluded in this, and the court cannot say that the issues or the evidence are the same as on the former trial. In the case of *Stager* v. *Troy Laundry Co.*, 41 Or. 141 (68 Pac. 405), cited upon this point by plaintiff, it was conceded at the hearing that the evidence was the same in both cases, and therefore is not applicable."

See, also, *Askay* v. *Maloney*, 92 Or. 566 (179 Pac. 899); *Palmberg* v. *Astoria,* 101 Or. 224 (199 Pac. 630, 16 A. L. R. 1125); *Robinson* v. *Kind,* 25 Nev. 261 (59 Pac. 863, 62 Pac. 705); *Lee* v. *Powell Bros. & Sanders Co.,* 126 La. 51 (52 So. 214).

16. A decision on a prior appeal is not conclusive upon the second appeal, where the former decision simply remanded the case for another trial, and the judgment itself was not final between the parties and not conclusive: *White* v. *Downs,* 40 Tex. 225; *Hastings* v. *Foxworthy,* 45 Neb. 676 (63 N. W. 955, 34 L. R. A. 321, and note K, page 336).

17. It therefore becomes imperative to consider the testimony in this case bearing upon the alleged rescission of contract Exhibit "A," in so far as the same affects the defendant growers and the other issues and equities of the case.

A careful reading and consideration of the testimony which is too lengthy to here discuss, leads us to the concluson that the defendant growers have failed to show that contract Exhibit "A" was rescinded or

abrogated. Taking all of the record it does not appear that the contract Exhibit "A" in so far as the same affects the growers in any way, has been modified so as to affect the bearing of the penalty clause which controls the liability of the growers by virtue of Exhibit "B" and of which the plaintiffs were bound to take notice.

In referring to the abrogation of Exhibit "A," one of the growers stated, in substance, that he understood that at the time ot the meeting of the growers, and the Union and one of the officers of the Northwest Company, that contract Exhibit "A" was to be canceled, according to the statement of the officer of the Union, in the presence of one of the officers of the Northwest Company. From the testimony we believe that it was the understanding between the interested parties at the time Exhibit "C" was circulated and signed that the old contract Exhibit "A," should be canceled when the new contract should be executed, pursuant to the authority of Exhibit "C." This was never accomplished. The new contract was never executed to take the place of the old contract Exhibit "A." In other respects the testimony substantially sustains the allegations contained in the answer of the defendant growers as to the representations made to them, in relation to the execution of the contract Exhibit "C."

The position taken by plaintiff, as shown by its brief, page 22, is stated thus:

"During the summer of 1918, an attempt was made by appellant Salem Fruit Union and respondent to execute a new contract which would take the place of Exhibit 'A' * * . The contract was approved as to form by respondent, and appellant was requested to execute it with the understanding that when so executed this contract would take the place

of Exhibit 'A.' Appellant thereafter refused to execute the contract.''

This is a suit against the defendant growers to enforce the specific performance of a contract. The suit, as affecting the growers, is principally based upon the contract Exhibit ''C,'' which plaintiff claims constitutes a contract between the grower and the Phez Company, as assignee of the Northwest Company.

18. The defendant growers, as a further objection to the enforcement of Exhibit ''C,'' contend that it lacks mutuality and consideration. The Northwest Company in no way made any promise by Exhibit ''C.'' It did not thereby bind itself in any way to do anything. It did not sign its name to the instrument or pay any consideration therefor. The contract should be enforceable on both sides in the same manner. It is not always held that the contract should necessarily be enforced on both sides by specific performance. There are certain exceptions, such as option contracts, which do not apply in this case. We read thus in 25 R. C. L. 232, § 33:

''It is frequently stated as a general principle of equity that a contract will not be specifically enforced unless it has such mutuality that it may be enforced by either party, and the language adopted by numerous courts is to the effect that equity will grant a decree of specific performance only in cases where there is a mutuality of obligation and of remedy. In accordance with this doctrine of mutuality it is held that when a contract for any reason cannot be enforced against one of the parties such party will not be permitted to enforce it specifically against the other party, although except for this particular rule the contract would otherwise have been enforceable.''

See Fry on Specif. Perform. of Cont. (6 ed.), page 219, § 460; Waterman on Specif. Perform. of Cont.,

§ 196; Pomeroy on Specif. Perform. of Cont. (2 ed.), § 162; *Butterick Pub. Co.* v. *Whitcomb,* 225 Ill. 605 (80 N. E. 247, 8 L. R. A. (N. S.) 1004); *Fowler Utilities Co.* v. *Gray,* 168 Ind. 1 (79 N. E. 897, 120 Am. St. Rep. 344, 7 L. R. A. (N. S.) 726).

19. As between the plaintiff and the defendant growers, the rights of the parties are measured and limited by the terms of contract, Exhibit "A," and contract Exhibit "B." For this purpose we must consider contract "A" only so far as it was authorized by the power of attorney Exhibit "B." Under the provisions of the contract, the growers who signed Exhibit "B" authorizing the execution of Exhibit "A" subject to the conditions contained in the ten cent per crate penalty clause, and who have not been released therefrom, are liable to the Salem Fruit Union for ten cents per crate penalty for each crate of berries which they raised during the years covered by the contract and which they failed to deliver in accordance with their stipulation in that respect.

20. It is contended by defendants J. W. Woodruff et al., that there can be no recovery of damages against the growers for a failure to deliver berries after the growers have sold and conveyed their respective lands upon which their berries had been grown, and they ceased to raise berries.

21. Taking the contract Exhibit "A" together with Exhibit "B" in its entirety, and considering all of the circumstances and the situation of the parties, the language thereof and the construction of the same by the parties themselves, as shown by their subsequent conduct, it does not appear that it was the intent of any of the parties, that if a grower died, or sold and conveyed his land in good faith and not for the purpose of avoiding his obligation, that such

grower, or his representatives, should go into the market and purchase berries to deliver under his contract, or would be required to deliver berries which he did not raise, or else suffer damages. No request was made by anyone for such delivery after such sale of land. The whole scheme was for pooling the crops of berries of the growers for the purpose of selling them together, and not for speculation on the part of the growers. All the names of the growers who signed Exhibit "B," together with their respective addresses, were appended to the contract Exhibit "A," and the number of acres of land and the estimated amount of berries expected to be raised by each grower. The Northwest Company was, at the time of the execution of Exhibit "A" aware of all of the facts and circumstances in relation thereto. The Union did not by Exhibit "A" contract to sell a definite quantity of berries, but *about* 1,200 tons. Therefore the growers who sold and conveyed their land and were released by the Union, should not be held liable for delivery of berries after such conveyance of their land, and the judgment for any such failure to so deliver should be reversed and eliminated from the record of the judgment and decree in favor of plaintiff. Also the judgment and decree against the growers who did not sign the contract Exhibit "B" should be reversed and eliminated from the record.

In accordance with the evidence in the case between the plaintiff and the defendant growers, taken since the former appeal and the ruling upon the demurrer of the growers to the complaint, the judgments and decrees in favor of plaintiff and against the several defendant growers are reversed and the suit is dismissed as against the defendant growers.

Pursuant to the mandate of the former opinion herein, the decree of the lower court as to the defendant Salem Fruit Union, except as affected and modified by the foregoing opinion, will be affirmed.

MODIFIED AS TO SALEM FRUIT UNION. REVERSED AND DISMISSED AS TO OTHER DEFENDANTS.

BROWN, J., concurs.

BURNETT, J., concurs in the result.

McBRIDE, C. J., Dissenting.—Upon the former trial of this case, *Phez Co.* v. *Salem Fruit Union et al.,* 103 Or. 514 (201 Pac. 222, 205 Pac. 970, 25 A. L. R. 1090), I wrote the opinion. It was not hastily prepared but was the result of several weeks of careful examination of the law and of the testimony, the results of which appear in the opinion.

Some new testimony has been taken on behalf of the growers of loganberries, which has not in any way altered the conclusions at which I arrived upon my former examination of the case. Testimony as to certain alleged declarations of officers of the Northwest Fruit Products Company, plaintiff's predecessor, has been introduced, relating to alleged false representations made by these officers before the signing of the exhibits introduced in evidence. Such representations, in my judgment, have no effect in face of the fact that the actual contracts were thereafter reduced to writing and are supposed to contain the final intent of the parties. The effect of these writings was to make the Salem Fruit Union the agent of the signers, and was a power coupled with an interest in the proceeds of the sale, and was therefore irrevocable. For this reason I thought then, and think now, that every signer of one of these instruments is liable, and that to release them from

liability will tend to encourage deliberate breaking of contracts when they become burdensome to one party or the other. My views are so clearly set forth in the previous opinion that it is unnecessary to repeat them at length here.

The decree of the court below should be affirmed.